**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON
CIVIL CASE NO: 08-109-DLB**

DOUGLAS J. ALGIE,                                                    PLAINTIFF

V.

NORTHERN KENTUCKY UNIVERSITY,                          DEFENDANT.


## REPORT & RECOMMENDATION

On June 17, 2008, plaintiff Douglas Algie initiated this litigation by filing a *pro se*

complaint against his former employer, Northern Kentucky University, alleging that the

defendant had discriminated against him during the course of his employment in violation of

Title VII of the Civil Rights Act of 1964.   On July 31, 2009, the defendant moved for summary

judgment.   The plaintiff has filed a response, to which the defendant has filed a reply.  Pursuant

to local practice, the motion has been referred to the undersigned magistrate judge for initial

consideration and a report and recommendation. See 28 U.S.C. §636(b).  Based upon the

undisputed facts of this case and applicable law, I conclude that the defendant's motion for

summary judgment should be granted.

### I.  Background and Procedural History

Because the plaintiff proceeds *pro se*, plaintiff's complaint initially was screened by this

court under the authority of *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).  In conducting that

initial review, the court reviewed plaintiff's prior similar litigation in this court:

> Algie was employed in the NKU printing department between 1999 and
> 2007.  Algie has filed other litigation in this Court alleging that NKU

1

discriminated against him on the basis of his gender and retaliated against him for complaining about job disparities between male and female workers in NKU's printing department.

On June 1, 2005, Algie filed Discrimination Charge No. 241-2005-01556 with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a "right to sue" letter on November 9, 2005. On January 27, 2006, Algie filed a Title VII civil action against NKU. *See Douglas Algie v. Northern Kentucky University*, Covington Civil Action No. 2:06-CV-23-JGW ("the First Algie Action").

In the First Algie Action, Algie alleged that between 1999 and 2001, NKU assigned two other female employees in the printing department preferential responsibilities that he had not been extended, which action Algie claimed resulted in better job advancement opportunities for them at NKU. ...

On July 23, 2007, Magistrate Judge J. Gregory Wehrman dismissed the First Algie Action [*See Id.*, Record No. 41]. .... Based on careful review of the record and after citing the case of *Ledbetter v. Goodyear*, 127 S.Ct. 2162 (2007), Magistrate Judge Wehrman concluded that no discrete discriminatory acts had occurred within the relevant 300-day period. Magistrate Judge Wehrman concluded that because Algie had waited nearly four years after the expiration of the 300-day period...., Algie's sex discrimination claims were time-barred....

Magistrate Judge Wehrman further concluded that to the extent Algie had complained of two alleged gender discrimination actions which did arise within the relevant ....limitation period, those claims were not meritorious. .... .....
Magistrate Judge Wehrman also dismissed Algie's retaliation claims, finding that Algie had failed to exhaust that claim. Magistrate Judge Wehrman noted that under Sixth Circuit case law, a retaliation claim raised in federal court is procedurally barred.. . .

The Memorandum Opinion from the First Algie Action included additional reasons for

denying the retaliation claim presented in that case:

> In addition, plaintiff's retaliation claim is time-barred. Algie testified in his deposition that the alleged retaliation occurred within a year and a half to two years of beginning his employment at NKU in 1999, years prior to the expiration of the relevant 300-day period. DE #34, Deposition at 186. Although in his response plaintiff newly asserts that the retaliation "continued until after Plaintiff's civil complaint...was filed on January 27,

2

> 2006," he previously testified in his deposition that NKU had not
> retaliated against him either after he filed the EEOC charge or for
> filing this lawsuit. *Id.* at 191 ("No, I would say not. In fact,
> they're very careful not to take any retaliatory actions now.")
> Plaintiff cannot defeat summary judgment by making
> unsubstantiated assertions in his response which contradict his
> prior sworn testimony.

Thus, in the First Algie Action, Covington Civil 06-23-JGW, the court determined that the

retaliation claims were procedurally barred based upon Algie's failure to exhaust, time-barred

based upon the date they arose,  and without merit based on Algie's deposition testimony that

NKU had not retaliated against him from the time he filed the EEOC charge until the date of his

deposition.

With respect to Algie's current complaint, the court initially dismissed plaintiff's

allegations *sua sponte* concerning (1) acts of alleged retaliation for having filed the June 1, 2005

EEOC charge, and (2) acts of retaliation for having filed the First Algie Action.  In dismissing

those particular claims, the court noted that they had previously been raised and dismissed by

this court in the First Algie Action. Doc. 5 at 7.

> Algie claims in the Second Algie Action that NKU retaliated against him
> for filing the First Algie Action.  However, Magistrate Judge Wehrman addressed
> and dismissed that specific claim on July 23, 2007, finding that Algie had refuted
> that claim in his deposition testimony given in the First Algie Action.  The
> Magistrate Judge specifically referred to Algie's deposition testimony wherein he
> stated that NKU had not retaliated against him either after he filed the June 1,
> 2005 EEOC Charge **or** after he filed the First Algie Action [See 06-CV-23, Mem.
> Op & Ord., Doc. 41, p. 12 (citing to Deposition, Doc. 34 at p. 191)].

In other words, this court concluded that Algie's gender discrimination and retaliation

claims associated with the June 1, 2005 EEOC charge, as well as the alleged retaliation from the

filing of the First Algie Action, were all barred under the doctrine of *res judicata* and therefore

should be dismissed with prejudice as "frivolous and devoid of merit."  The court additionally

3

dismissed without prejudice Algie's claim of employment discrimination based on a medical disability, because Algie had failed to present that claim to the EEOC. The only claims permitted to proceed in this Second Algie Action are those based on alleged discrimination that occurred "on or after April 10, 2007, through and including his termination in September of 2007."

The parties conducted relatively extensive discovery on these limited claims, resulting in several discovery-related motions that required judicial resolution. On July 31, 2009, NKU filed a motion for summary judgment, arguing that Algie's gender discrimination claim must be summarily dismissed, and that he cannot prove essential elements of his remaining retaliation claim.

### II.  Motion for Summary Judgment

### A.  Procedural Issue Regarding Plaintiff's Response

On September 14, 2009, the defendant moved to strike plaintiff's response to its motion as untimely. The defendant moved for summary judgment on July 31, 2009. Including the extension of three days for service, plaintiff was required to file his response not later than August 18, 2009. However, plaintiff did not file his response until September 2, more than two weeks out of time. The plaintiff did not move for an extension of response time. The defendant argues that even though plaintiff proceeds *pro se*, his extensive litigation experience is reason enough not to permit him to flaunt ordinarily applicable time limitations.

On September 28, plaintiff moved separately for an extension of time, seeking to excuse his tardy response. Plaintiff argues that he was slowed in his response by the need to review extensive discovery documents produced by the defendant in early July (still weeks before

defendant filed its motion). Plaintiff complains that the defendant has yet to fully comply with the court's June 17, 2009 order directing the defendant to supplement its discovery responses. Plaintiff argues that it would be unjust to permit dismissal of plaintiff's lawsuit without requiring the defendant to produce one missing document, and that this court should further delay disposition of the pending motion for summary judgment until defendant produces the item. *See* Doc. 43 (Plaintiff's Memorandum in Opposition to Defendant's Motion to Strike); Doc. 45 (Memorandum In Support of Motion to Extend Time).

Ordinarily, a motion seeking an extension of time must be filed *prior to* the expiration of the court deadline for which extension is sought. Although the plaintiff's excuses do not amount to just cause for his untimely response, it is the general custom and practice of this court to warn litigants of their neglect if no timely response to a dispositive motion has been received and the court intends to rule without benefit of a response. In this case, plaintiff filed his response 15 days out of time, but prior to the court putting on any type of "show cause" order. Had plaintiff sought an extension prior to the expiration of his deadline, it is likely considering plaintiff's *pro se* status that a brief extension would have been granted. Considering the totality of the circumstances, by separate order the court will grant plaintiff's tardy motion for extension, deny defendant's motion to strike, and consider plaintiff's response to defendant's motion as if timely filed. Given the same totality of circumstances, the court declines to review the issue of whether the defendant fully complied with the court's June 17, 2009 discovery order, and finds no cause to further delay disposition of defendant's dispositive motion.

### B. Standard of Review

Summary judgment is only appropriate when there are no issues of material fact in

dispute, and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ.

P.  Most of the facts of this case are undisputed.  To the extent that factual issues remain, the

court has drawn all reasonable inferences and construed the facts in favor of the plaintiff, as the

party opposing summary judgment in this case.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

### C.  Gender Discrimination Claim

The defendant argues that it is entitled to summary judgment on Algie's gender

discrimination claim, based upon Algie's deposition testimony that he is not currently alleging

sexual discrimination but only retaliation for having filed a prior sexual discrimination claim.

*See* Doc. 36, Algie Deposition at page 117.  In a prior order, this court noted that Algie is not

currently pursuing a claim for gender discrimination in this Second Action.  Doc. 33 at 2.[1]

In his response to the defendant's motion, Algie does not contend that he is in fact pursuing such

a claim; therefore, to the extent that the claim ever existed in *this* case, the defendant is entitled

to summary judgment.

### D.  Retaliation Claim

Just as he did in the First Algie Action, plaintiff alleges that the defendant violated Title

VII by retaliating against him based upon his prior complaints of gender discrimination.  This

court has already determined that the only viable retaliation claim not barred by the doctrine of

*res judicata* is a claim regarding events that occurred during the six months after April 10, 2007

---

[1]Algie's gender discrimination claim in the First Algie Action was dismissed both as time-barred and for failure to prove essential elements.

up to plaintiff's termination on October 1, 2007.[2]  In his responsive memorandum, plaintiff
repeatedly raises issues barred by the doctrines of *res judicata* and law of the case.  Plaintiff may
not relitigate issues previously decided.  Unless necessary for disposition of the issues in dispute
in this litigation, plaintiff's arguments concerning previously determined issues will not be
discussed.

### 1.  Prima Facie Case

In order to prove a prima facie case of retaliation, a plaintiff must demonstrate four
elements: 1) he engaged in Title VII protected activity; 2) his employer knew that he engaged in
the protected activity; 3) the employer subsequently took an adverse employment action against
him; and 4) the adverse action was causally connected to the protected activity.  *See Ladd v.
Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)(additional citations omitted).  A
plaintiff's "burden of establishing a prima facie case in a retaliation action is not onerous, but
one easily met."  *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004).  Minor disputes between
the parties exist concerning the nature of the alleged retaliatory conduct and the nature of the
plaintiff's protected activity, but the primary dispute in this case concerns the fourth element -
whether plaintiff can show a causal connection between the protected activity and the adverse
employment action.

### a.  The Retaliatory Conduct

There is no dispute that the defendant took an adverse action against the plaintiff when it
terminated his employment on October 1, 2007.  In his responsive memorandum, plaintiff argues

---

[2]Although outside counsel advised counsel for NKU by letter dated September 26, 2007
to terminate the plaintiff, plaintiff's employment was not actually terminated until the following
Monday, on October 1, 2007.

that his termination was not the only retaliatory act taken against him, and that various other actions by defendant also constitute retaliation.  For example, plaintiff complains vociferously about his supervisor's failure to timely provide him with a written copy of his annual evaluation ending March 31, 2007.  Although plaintiff concedes that three supervisory personnel reviewed the evaluation with him on April 10, 2007, one of the supervisors did not initially sign the form as required and so a copy was not provided to plaintiff until four months later. Plaintiff does not claim that the paper copy he ultimately received was different in any respect than the evaluation previously reviewed with him in person.  Plaintiff demonstrates no prejudice resulting from the delay in receipt of his paper copy; the delay does not appear to rise to the level of an adverse employment action.

Other similar claims are not discussed herein because a plaintiff may not create new claims in an effort to defeat summary judgment when those claims are contrary to his earlier deposition testimony.  In plaintiff's January 7, 2009 deposition, he testified affirmatively that the *only* retaliatory act that this lawsuit concerns is his termination.  Doc. 36, Deposition at pp. 121-122.  All of the actions which plaintiff presents in his unsworn responsive memorandum as new "retaliatory acts" are alleged to have occurred prior to that January 7, 2009 deposition testimony. Therefore, they are not further considered.  *See Aerel, S.R.L. v. PCC Airfoils*, 448 F.3d 899, 906 (6th Cir. 2006)(affidavit that contradicts prior testimony cannot serve as summary judgment evidence).

### b. The Nature of the Protected Activity

The protected activities in which plaintiff has engaged include: 1) a June 1, 2005 EEOC charge; 2) the First Algie Action filed on January 27, 2006; 3) a June 9, 2007 EEOC charge;  4) a

November 26, 2007 EEOC charge; and 5) this Second Algie Action filed on June 17, 2008 .[3]

The fact that the first two of these protected activities took place prior to April 10, 2007 with no

retaliatory conduct for more than 18 months does not mean that the defendant could not have

retaliated against plaintiff, but the length of time between those early activities and the

termination in October of 2007 makes a causal connection between those events remote.  The

last two protected activities occurred *after* plaintiff's employment was terminated; therefore,

they cannot serve as the basis for plaintiff's retaliation claim.

In short, the only protected activity on which plaintiff realistically could base his current

retaliation claim is the filing of the June 9, 2007 EEOC charge.  Plaintiff also refers to the

dismissal of the First Algie Action on June 23, 2007 as a key event, but the dismissal of a lawsuit

by this court is not a protected activity engaged in by the plaintiff which could form the basis for

a retaliation claim.[4]  Plaintiff was terminated by defendant on October 1, 2007, almost four

months after he filed his last EEOC complaint.  Defendant argues that plaintiff's only proof that

the termination relates to his EEOC complaint is the temporal proximity of the two events.

Thus, plaintiff's prima facie case rises or falls on whether he can establish the fourth element of

his retaliation claim: causal connection.

### c.  Causal Connection

In order to prove the "causal connection" element of his claim, "a plaintiff must proffer

---

[3]In addition, the record reflects that at some point in 2007, plaintiff filed two claims with OSHA against the defendant, both of which were dismissed.

[4]Again, this court has previously determined that the filing of the First Algie Action in January of 2006 resulted in no retaliatory conduct by the defendant at least up through April 10, 2007.

9

evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)(quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).  The timing of the plaintiff's protected activity and the defendant's alleged retaliatory conduct is often relevant to the inquiry of whether plaintiff can prove a causal connection.  In fact, temporal proximity alone can be sufficient to establish a prima facie case in some cases.  In other cases, additional evidence is required, such as evidence that the plaintiff was treated differently than similarly situated employees, *see Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999), or that the plaintiff was subjected to increased disciplinary scrutiny.  *See Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir. 2001).

The Sixth Circuit recently clarified the circumstances in which temporal proximity, standing alone, might be sufficient to establish the causal nexus necessary to establish a prima facie case of retaliation.

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.  But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)(evidence that employee fired the same day employer learned of EEOC charge brought case within limited number of cases where temporal proximity sufficient) .  However, the court has not established any black letter rule concerning just "how close" events need to be before temporal proximity alone is sufficient to establish the causal element of a prima facie case.  *See e.g., Singfield v. Akron*

10

*Metro. Hous. Auth.*, 389 F.3d 555, 556 (6th Cir. 2004)(three months "significant enough");

*Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)(four months insufficient);

*Goller v. Ohio Dep't of Rehab. & Corr.,* 285 Fed. Appx. 250, 257 (6th Cir. 2008)(two months

sufficient); *Vaughn v. Louisville Water Co.*, 302 Fed. Appx. 337, 349-50 (6th Cir.

2008)(assuming without deciding four months sufficient).

    In at least one unpublished case, the Sixth Circuit held on similar facts that temporal

proximity was not sufficient.  *See Johnson v. Cleveland City School*, 2009 WL 2610833 (6th Cir.

Aug. 25, 2009)(passage of over a year since the first administrative charge and termination, and

three months between filing of lawsuit and termination, was not sufficiently close in time to

show causation absent additional evidence).  Contrary cases with similar time periods can be

found, but involve distinguishable facts concerning increased scrutiny or additional adverse

employment actions.  *See Hamilton v. General Elec. Co.*, 556 F.3d 428, 435-436 (6th Cir.

2009)(increased scrutiny in combination with temporal proximity of termination less than 3

months after EEOC filing sufficient); *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576 (6th Cir.

2009).  In this case, the sole basis for plaintiff's claim of retaliation is his termination.

    Although a three to four month period between the protected activity and the adverse

employment action might be sufficiently close to establish a prima facie case at times, I conclude

that the temporal proximity between the filing of plaintiff's last EEOC complaint and plaintiff's

termination is not sufficient by itself to prove this plaintiff's prima facie case.  In reaching this

conclusion, I note the court's prior findings that the defendant took absolutely no retaliatory

action against the plaintiff for a period of nearly two years, from the time he filed his first EEOC

charge on June 1, 2005 through April 10, 2007, including when he was engaged in litigation in

this court.  Plaintiff's supervisors did not change between April 10, 2007 and his termination on October 1, 2007.  It defies common sense that the filing of a new EEOC charge in early June would have prompted them to take retaliatory action months later based on that singular event, when they had taken no action in more than two years prior to that event for plaintiff's prior and nearly identical protected conduct.  Because plaintiff offers nothing more to show that his termination was motivated in any way by the filing of his last EEOC charge, he has failed to establish a prima facie case and defendant is entitled to judgment as a matter of law.

### 2.  Failure to Prove Pretext

If a prima facie case is established, the burden of producing some legitimate, non-discriminatory reason for the discharge falls upon the defendant.  *See Upshaw,* 576 F3d at 585.  If the defendant produces such a reason, the burden of production shifts back to the plaintiff to show that the defendant's proffered reason or reasons were pretextual.  *Id.*  However, the burden of persuasion remains with the plaintiff throughout.  *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d at 502.

Although I have found the defendant to be entitled to summary judgment based upon plaintiff's failure to establish a prima facie case, I conclude in the alternative that the defendant is entitled to judgment because plaintiff has failed to show that the defendant's stated reasons for his termination were pretextual.  The defendant contends that it terminated plaintiff for resume fraud, insubordination, constant monitoring of co-workers, and safety concerns.  To show that these reasons were pretextual, the plaintiff must demonstrate that they: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) were insufficient to warrant the challenged conduct.  *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir.

12

2003)(additional citation omitted).  When as in this case the defendant has offered multiple reasons for plaintiff's termination, a plaintiff "must show that each reason was pretextual."  *See Myers v. U.S. Cellular Corp.*, 257 Fed. Appx. 947, 952 (6th Cir. 2007).  Regardless of whether a plaintiff establishes a prima facie case, if an employer offered a legitimate non-discriminatory reason for the adverse employment action, the plaintiff must carry his burden of production and persuasion on the issue of pretext.  *See Ladd*, 552 F.3d at 502 (granting judgment to employer based upon plaintiff's failure to show pretext).

### a. Resume Fraud

With respect to the first reason, resume fraud, the defendant states that plaintiff failed to disclose on his employment application that he pleaded guilty to felony trafficking of marijuana, and grossly misrepresented the number of marijuana plants at issue when asked about the conviction.  In addition, defendant complains that plaintiff did not disclose that he was charged with possession of a firearm.  Resume fraud is a legitimate ground for dismissal.  *See, e.g. Moos v. Square D Co.*, 72 F.3d 39, 43 (6th Cir. 1995).  The fact that an employer discovers alleged resume fraud during litigation does not require the employer to ignore the fraud, if it otherwise would lead to a legitimate discharge.  *See generally McKennon v. Nashville Banner Pablo Co.*, 513 U.S. 352, 362 (1995)(after-acquired evidence will not bar all relief if employee wrongfully discharged, but generally renders reinstatement and front pay inappropriate).

Plaintiff's 8/31/99 application for employment is part of the record.  The application asks "Have you ever been convicted of a felony? If yes, explain:" Plaintiff's response states: "Yes, cultivation of marijuana, a tray of discarded seedlings were confiscated on my property after I made the decision to give up smoking about one year ago."  Plaintiff certified at the end of his

13

application that any misrepresentation may cause "termination of my employment." Employment Application of Doug Algie, Doc. 35, Exhibit A.

The job application does *not* ask what *charges* have been filed against the applicant, but seeks information only concerning felonies for which the applicant has been convicted.   In this case, plaintiff admitted a cultivation conviction but failed to disclose that he was convicted of the additional felony of marijuana trafficking.  The defendant contends that plaintiff's omission was material insofar as he represented that he was convicted for cultivation based upon a tray of "discarded seedlings" rather than 53 plants as later discovered, and because he omitted the trafficking conviction.  The defendant asserts that it would not have hired anyone with a trafficking conviction given its status as a public university serving students ranging in age from 18 to 24.  In fact, plaintiff's own deposition testimony appears to concede that same distinction:

> Q You could understand the University's concern with a trafficking charge at a public university with students in age ranges from 18 to 24; do you understand that concern?
>
> A Well, yeah, because there was another conviction, Dr. Alfords was convicted while I was employed there for trafficking, who was caught in the act of trafficking.

Doc. 36, Algie Depo. at 161.

Plaintiff argues that the defendant would not have terminated him but for his protected activities, but fails to offer any real evidence of pretext.  Instead, plaintiff contends that the application was unclear because it did not specifically require him to list *each* felony for which he was convicted.  In plaintiff's view, the application's vague request that he "explain" any felony conviction together with space limitations justified his limited response.  Plaintiff argues that his response was truthful, because the application did not specifically ask for all details or

14

circumstances.  According to plaintiff, defendant did not appear interested in those details at the time.  Plaintiff also alleges that he was questioned "extensively" in a January 13, 2007 deposition regarding his conviction, implying that his employer learned of the trafficking convictions at that time but did not fire him then.  However, plaintiff cites to no specific pages of the earlier transcript to substantiate this claim.

In any event, plaintiff's response reflects a fundamental misunderstanding of the nature of the inquiry.  The issue is not whether plaintiff intended to mislead his employer but rather, whether his employer was justified in interpreting plaintiff's response as resume fraud and terminating him based on that fraud, or whether that interpretation was pretextual.  I agree with plaintiff only to the extent that any focus by the defendant on the *charges* brought against plaintiff cannot constitute resume fraud, because the application does not seek information concerning charges.[5]  Otherwise, however, I find no evidence of pretext.

Attachments to the defendant's motion for summary judgment, including the affidavit of counsel, reflect that defendant did not become aware of all pertinent details of plaintiff's convictions until September of 2007, shortly before plaintiff's termination.  Even if plaintiff's supervisors had been aware of the trafficking conviction earlier in 2007, the fact that they waited to terminate him until additional concerns increased to a cumulatively unacceptable level does not mean that the reasons for termination were pretextual. An employer should not be required to terminate a long-term employee for a single terminable offense if it wishes to give that employee additional time to improve his behavior.  Likewise, evidence that the employer delayed

_____

[5]As discussed below, the defendant's consideration of the prior charges was not wholly irrelevant, to the extent that defendant considered plaintiff's gun charge in assessing its asserted safety concerns.

termination until the employee's violations became "unbearable" should not suffice as evidence of "pretext."

### b. Insubordination and Coworker Issues

The defendant also alleges that it terminated plaintiff for persistent insubordination and as a result of his interpersonal difficulties with coworkers.  *See Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)(discharge for insubordination legitimate, non-discriminatory reason).  The defendant notes performance reviews in 2005, 2006, and 2007 all refer to these issues and Algie's need to improve interpersonal skills.

Plaintiff's performance review for the year ending March 2005 noted that plaintiff exceeded expectations in no areas at all, met expectations in four areas, and needed improvement in six areas, including "adaptability," "interpersonal skills" " team player" "reliability" "judgment and decision making" and "drive and commitment."  Doc. 35, Exhibit C.  A review for the year ending March 2006 noted similar deficiencies, including "needs improvement" in "quantity of work" "team player" "reliability" "communication skills" "judgment and decision making" and "drive and commitment."  *Id.*, Exhibit D.  Supervisory comments dated 3/23/06 reflect "some improvement" over the prior year but express multiple continuing concerns:

> A concern continues to be Doug's interpersonal skills, and his reluctance to be a "team player."  He has little interaction with the rest of the department and demonstrates a lack of enthusiasm for his responsibilities, as reflected by his self-evaluation.  He does work cooperatively on individual projects, but does not seem concerned with the mutual goals of the department.  Another area of concern is the quantity of work.

*Id.*  A stated goal was to "increase interaction and improve interpersonal skills as to departmental responsibilities and goals."  *Id.*

Plaintiff's review dated 3/30/07 demonstrates further significant decline in his job

16

performance.[6]  On that review, he is rated as having met expectations in only two categories, but as needing improvement in each of the remaining eight categories.  His overall performance rating also fell to "needs improvement."  His supervisor's comments complained of a "disappointing" work performance due to absenteeism, issues with productivity, and "lack of interaction with the rest of the department" including "resistence when asked to change lunch or break schedules to accommodate coworkers."  Doc. 35, Exhibit E.

In addition, plaintiff began monitoring his coworkers' performance and wrote letters detailing their alleged violations of company policy or other errors, adding to his interpersonal issues.  For example, in a four-page single spaced self-evaluation dated 3/15/07, plaintiff made multiple complaints relating to co-workers and supervisors and attached a "log" of employee records  that he compiled noting when various co-workers were "outside smoking," late to work, or otherwise engaged in non-work related conduct (e.g., "eating a bowl of cereal at start of work").  *See* Doc. 35, Exhibits G and H.  An employee's termination for a poor attitude and a poisonous relationship with coworkers can be legitimate and non-discriminatory. *See Das v. The Ohio State University*, 57 Fed. Appx. 675, 681 (6th Cir. 2003)(discharge based upon employee's confrontational and aggressive stance with other employees was legitimate and nondiscriminatory).  Plaintiff compiled these records concerning his co-workers over approximately two years, without the approval of his supervisor or NKU management.  Doc. 36, Deposition at p. 94.

The defendant states that it was particularly concerned with plaintiff's July 18, 2007

---

[6]It bears repeating that the date of this review and prior performance reviews falls outside the scope of the retaliatory conduct allegedly at issue in this lawsuit, which is limited to conduct after April 10, 2007 and more specifically, to plaintiff's termination.

letter to plaintiff's supervisor, with additional supervisory personnel carbon copied, in which plaintiff complained about a co-worker, James Parker.  In that letter, plaintiff suggested that Mr. Parker was "aggressive and hostile" toward the plaintiff and that plaintiff was "seriously questioning Mr. Parker's mental stability to understand his responsibility as Pressroom Supervisor and the limitations of those responsibilities."  Doc. 35, Exhibit J.

Plaintiff disputes that his monitoring of co-workers was a legitimate concern, noting that plaintiff's supervisors never asked him to refrain from doing so and that no one ever specifically complained of that particular behavior during plaintiff's evaluation on April 10, 2007.  Based upon his employer's failure to raise the issue at that time, plaintiff argues that including the issue as grounds for termination was pretextual.  After all, plaintiff argues that his supervisors were in possession of plaintiff's March 15, 2007 self-evaluation that included his log of his co-workers at the time of his April 2007 evaluation.

Plaintiff's own viewpoint notwithstanding, the record reflects that plaintiff's supervisors believed that plaintiff's co-workers were aware of plaintiff's efforts to monitor their behavior and felt "unnerved" by that behavior.  There is certainly no dispute that plaintiff's supervisors were aware of plaintiff's continuous documentation of his co-workers.  Plaintiff was repeatedly warned of problems with his interpersonal skills, including his relationships with coworkers and supervisors.  Defendant's knowledge of plaintiff's monitoring of coworkers after plaintiff had previously been counseled to improve those relationships supports a finding that plaintiff's termination on this ground was not pretextual.  In short, plaintiff offers no evidence that management's ongoing concern with his interpersonal issues was pretextual.

The defendant also asserts that plaintiff was insubordinate when prior to and following

18

the March 2007 review, in March, May and July of 2007, plaintiff wrote letters to the defendant's HR Director and others that questioned his supervisors' characters and abilities to perform their jobs.   Doc. 35, Exhibit F.  Plaintiff argues that the charge of insubordination is also pretextual because that charge was not raised at his April 10 annual evaluation.  However, most of the conduct that defendant refers to as insubordinate occurred after the April 10 evaluation, because it was presented in plaintiff's May and July 2007 letters in which he complained of supervisors' conduct.   Moreover, supervisory written comments on the 3/30/07 evaluation express concern with plaintiff's propensity to question production decisions made by management which the supervisor notes is "not Doug's responsibility."  The reviewer states that plaintiff "needs to work to improve his professionalism when given new instructions" and sets as one of several goals the need to "[i]ncrease interaction and work to improve interpersonal skills as to job responsibilities and production goals."  Therefore, plaintiff has offered no real evidence that the charge of insubordination was pretextual.

### c.  Safety Concerns

On September 10, 2007, plaintiff's supervisor Jo Ann Fincken met with other NKU management, NKU's general counsel, and outside litigation counsel to discuss plaintiff's behavior, monitoring of coworkers, and job performance.  Fincken advised counsel that plaintiff had become "unbearable" in the workplace and that other employees were "unnerved" by plaintiff's monitoring of them.  Defendant was particularly concerned with plaintiff's July 18 letter.  Ms. Fincken also advised counsel of her concern that plaintiff had a prior arrest for gun possession, a fact concerning which counsel was previously unaware.  Doc. 35, Exhibit B (Affidavit of Jo Ann Fincken).  Finally, Fincken commented that plaintiff "is becoming

increasingly withdrawn from his coworkers and behaving strangely at work," giving specific

examples of plaintiff's behavior. Doc. 35, Exhibit K, Attachment 1 at p 7 (letter from outside

counsel to General Counsel for NKU). Defendant notes that the historical context of the then-

recent April 16, 2007 Virginia Tech massacre contributed to plaintiff's supervisor's concerns

with what she viewed as increasingly bizarre behavior by the plaintiff.

      Following the meeting, counsel searched public records and discovered that Algie was

previously charged with possession of drug paraphernalia (to which he pleaded guilty in 1993),

for harassment in 1995 (charge dismissed), and for domestic violence in 1995 (emergency

protective order entered but case ultimately dismissed). Doc. 35, Exhibit K (Affidavit of

counsel). Counsel also discovered that plaintiff had been charged with fourth degree assault in

connection with cultivation and trafficking charges, that he pleaded guilty to misdemeanor

harassment after the charge was amended,[7] and that his arrest on trafficking concerned the

discovery of 53 marijuana plants, not just a "tray of discarded seedlings." Plaintiff's felony

trafficking charges were initially enhanced due to the number of plants at issue and because

plaintiff possessed a firearm. *Id.*

      In light of perceived misrepresentations on plaintiff's job application, plaintiff's criminal

record, monitoring of coworkers, poor performance reviews and concern with the safety of

coworkers, NKU's general counsel asked for advice from outside counsel as to how to proceed.

Outside counsel instructed defendant in writing to terminate plaintiff's employment based upon

plaintiff's material misrepresentations of his criminal record in his employment application, as

---

[7]Plaintiff disputes this fact, but counsel's affidavit supports a good faith belief of its veracity by the defendant.

well as on the basis that plaintiff "may present a safety risk to the NKU community"given his

"increased combativeness with and surveillance of coworkers and supervisors," and based upon

plaintiff's "continued poor job performance."  Doc. 35, Exhibit K, letter dated 9/26/07,

Attachment 1.  Plaintiff was terminated shortly thereafter and security guards escorted plaintiff

from the workplace.

Plaintiff's July 18 letter was one of several instances specifically noted by defendant as

presenting "legitimate safety concerns." On September 10, 2007, plaintiff's supervisor expressed

concern about plaintiff's behavior in light of his arrest years earlier for gun possession.  To prove

pretext, plaintiff must "put forth evidence which demonstrates that the employer did not

'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action."

*Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001).  In this case, plaintiff offers no

evidence that defendant trumped up its concern with his prior gun charge, or that the defendant's

expressed safety concerns were pretextual.

### E.  Failure to Mitigate

I have determined that the defendant is entitled to summary judgment because plaintiff

has failed to prove his prima facie case or that defendant's legitimate reasons for terminating him

were pretextual.  The defendant additionally claims entitlement to summary judgment on the

basis that plaintiff cannot prove any monetary damages resulting from the alleged retaliatory

conduct, because he failed to provide any evidence that he sought similar employment.  Parties

filing retaliation claims are required to mitigate their damages.  See 42 U.S.C. §2000e-5(g)(1)

(2009).  In this case, plaintiff became a full-time student within months of his discharge.  Courts

have held that a Title VII plaintiff may not recover front pay when he returns to school rather

than searching for employment. *See e.g., Floca v. Homecare Health Services, Inc.*, 845 F.2d 108, 113 (5th Cir. 1988).  The defendant has offered evidence that plaintiff increased his class schedule from five credit hours in the fall of 2007 at the time of his termination to 14 credit hours the following spring semester.  I agree that the increase in credit hours would have precluded plaintiff from pursuing full-time employment, based upon his own testimony.  However, it is unnecessary to determine whether plaintiff would be able to obtain a back pay award from his termination on October 1, 2007 until he became a full-time student in January 2008 because the defendant is entitled to judgment on other grounds.

### III. Conclusion and Recommendation

For the reasons stated herein, **IT IS RECOMMENDED HEREIN** that the plaintiff's motion for sanctions against the defendant [Doc. 37] be **denied**, that defendants' motion for summary judgment [Doc. 35] be **granted** and that this action be stricken from the active docket of this court.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service or further appeal is waived.  *U.S. v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)(citing *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991)).   Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal.  *Howard*, 932 F.2d at 509.  A party may respond to another party's objections within ten days of

22

being served with a copy of those objections.  Fed. R. Civ. P. 72(b)(2).

This 19th day of October, 2009.

Signed By:

_J. Gregory Wehrman_

United States Magistrate Judge