**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 08-109-DLB-JGW**

**DOUGLAS J. ALGIE**                                                                    **PLAINTIFF**


**vs.**                                    **MEMORANDUM OPINION AND ORDER**


**NORTHERN KENTUCKY UNIVERSITY**                                        **DEFENDANT**

\*      \*      \*      \*      \*      \*      \*

This matter is before the Court on remand from the Sixth Circuit with instruction to address Plaintiff Douglas Algie's Family and Medical Leave Act retaliation claim. Defendant Northern Kentucky University has moved for summary judgment on this remaining claim (Doc. # 75), which is fully briefed and thus ripe for review.  (Docs. # 76, 79, and 80).  For the reasons set forth below, Defendant's motion is hereby **granted**.

**I.      PROCEDURAL HISTORY**

On June 17, 2008, Plaintiff filed a pro se complaint against his former employer, Northern Kentucky University (NKU).  Following an initial screening, the Court dismissed several of his claims, including a claim construed as a Title VII medical disability claim. (Doc. # 5).  The parties subsequently engaged in discovery, and the Court ultimately entered summary judgment in favor of NKU as to the remaining claims.  (Doc. # 52).

On review, the Sixth Circuit affirmed the entry of summary judgement, but vacated dismissal of the perceived Title VII medical disability claim and remanded for further proceedings.  (Doc. # 57).  In doing so, the appellate court concluded that the Court's

1

initial-screening order misconstrued a Family and Medical Leave Act (FMLA) retaliation claim as a medical disability claim, thereby resulting in an inappropriate dismissal. (*Id.* at 10). Because "the claim should have been addressed, not dismissed," the Sixth Circuit remanded the case back to this Court. (*Id.* at 9-11).

## II.  FACTUAL BACKGROUND

Plaintiff was employed in the NKU printing department between 1999 and 2007. Because his remaining FMLA retaliation claim derives from his termination on October 1, 2007, the facts discussed herein are taken from the following exhibits:  Plaintiffs' FMLA certifications; several performance reviews; time sheets; an e-mail exchange between Plaintiff and Maria Chisholm, a human resources employee for NKU; a letter from defense counsel addressed to Sara Sidebottom, Vice President of Legal Affairs and General Counsel for NKU; and a sworn statement from Ms. Sidebottom.

While employed at NKU, Plaintiff was subject to annual performance reviews.  On March 14, 2002, Plaintiff was assessed as exceeding expectation in no areas, meeting expectations in six areas, and as needing improvement in the following categories: "Level of technical competence and knowledge," "Team Player," "Reliability," and "Communication Skills."[1]  (Doc. # 75-4, at 1).  Although his overall performance was assessed as meeting expectations, his supervisor commented as to problems Plaintiff's "absenteeism and the effect it has on our production, following procedures, and communication with co-workers," and stated that he "needs to work on becoming part of the team and improving communication with others.  He needs to become aware of the day-to-day production

---

[1]It is unclear whether Plaintiff was assessed as meeting expectations or needing improvement with respect to "Interpersonal Skills," so this category is construed in his favor.

environment and how each area affects the others.  Also, his duties need to be carried out in a timely fashion (i.e., often absenteeism adds to this dilemma)."  (*Id.* at 1-2).

Plaintiff's reviews improved over the next two years.  On March 10, 2003, Plaintiff was assessed as exceeding expectations in five categories, meeting expectations in five others, and needing improvement in none.[2]  (Doc. # 76-7, at 2).  His overall performance was characterized as meeting expectations.  (*Id.*).  On March 4, 2004, Plaintiff was assessed as exceeding expectations in seven categories, meeting expectations in three others, and needing improvement in none.[3]  (*Id.* at 3).  His overall performance was characterized as exceeding expectations.[4]  (*Id.*).

In 2006, Plaintiff filed two FMLA certifications with NKU.  (Doc. # 74-1, at 23).  The first certification, dated July 6, 2006, provided him with intermittent leave for his own rheumatoid arthritis.  (Doc. # 74-1, at 28-30); (Doc. # 75-2).  The second certification, dated November 16, 2006, also permitted intermittent leave, although this was to allow Plaintiff to care for his wife.  (Doc. # 74-1, at 36-38); (Doc. # 75-3).

Five days after the filing of the second certification, Maria Chisholm, a human resources employee, e-mailed Plaintiff concerning the designation of FMLA leave on his time sheets.  (Doc. # 74-1, at 49); (Doc. # 75-6).  In that exchange, Ms. Chisholm stated as follows:

---

[2]It is unclear whether Plaintiff was assessed as exceeding or meeting expectations with respect to "Communication Skills," so this category is construed in his favor.

[3]It is unclear whether Plaintiff was assessed as meeting expectations or needing improvement with respect to "Reliability," so this category is construed in his favor.

[4]It is unclear whether Plaintiff was assessed as exceeding or meeting expectations with respect to his overall performance, so it is construed in his favor.

> Several weeks ago we discussed your intermittent FMLA leave.   We discussed the appropriate procedures on requesting intermittent leave under FMLA (see below).   As a follow up to our discussion, you were going to provide me with a listing of absences since July 2006 that should be designated as FMLA intermittent leave, to date I have not received your listing.
>
> Please provide your list no later than December 8, 2006, in order for your absences/leave to be protected under FMLA.

(Doc. # 75-6).  Sometime thereafter, Plaintiff responded that he was "unable to locate and determine FMLA absences at this time without a great deal of time and trouble," but that he would designate such absences going forward.  (*Id.*).

As he admitted in the e-mail exchange, Plaintiff did not begin designating FMLA leave on the time sheets until late 2006.  (Doc. # 75-7); (Doc. # 75-8).  According to his time sheets, which covered early March 2006 until early May 2007, Plaintiff missed over 160 hours for vacation time and 180 for sick time, not all of which was designated as FMLA leave.[5]  (*Id.*).  More to the point, Plaintiff missed just over 40 hours for sick time prior to filing his first FMLA certification on July 6, 2006[6] and only designated roughly 50 hours as FMLA leave.  (*Id.*).  With specific respect to those designations, the last dates Plaintiff took such leave for his wife's condition and his own condition were December 13, 2006 and January 30, 2007, respectively.[7]  (Doc. # 75-8).

Plaintiff's final performance review was conducted on March 30, 2007.[8]  In that

---

[5]Plaintiff designated his own condition on the time sheets as "FMLA 1" and his wife's condition as "FMLA 2."  (Doc. # 74-1, at 38).

[6]*See* (Doc. # 74-1, at 39-40) (explaining how to read the time sheets).

[7]*See supra* note 6.

[8]Although filed in the record, neither Plaintiff nor NKU specifically referenced his 2005 or 2006 Performance Review.  *See* (Doc. # 35-5) (2005 Review); (Doc. # 35-6) (2006 Review).

4

review, which covered most of the time period reflected in the time sheets, Plaintiff was assessed as exceeding expectation in no areas, meeting expectations in two areas, and as needing improvement in each of the remaining categories, which again included "Team Player, "Reliability," and "Communication Skills," as well as "Quantity of work," Adaptability," "Interpersonal Skills," "Judgment and Decision Making," and "Drive and Commitment." (Doc. # 75-5, at 1). Plaintiff's overall performance was also characterized as needing improvement, and his supervisors described his work performance as "disappointing" and his absenteeism as "disruptive to production schedules," and further commented that Plaintiff's "productivity is not improving" and that he becomes "defensive when questioned." (*Id.* at 1-2). Finally, his supervisor noted that Plaintiff rarely interacted with the rest of the department, demonstrated little interest in the goals and direction of the department, resisted when asked to change lunch or break schedules to accommodate coworkers, and questioned production decision made by management. (*Id.* at 2).

Almost six months after his 2007 Performance Review, defense counsel drafted a letter to Sara Sidebottom, Vice President of Legal Affairs and General Counsel for NKU, recommending that the university terminate Plaintiff's employment.[9] (Doc. # 75-9); (Doc. # 75-10). This letter, dated September 26, 2007, indicated that Plaintiff "materially misrepresented his criminal record both on his application for employment and in [a 2007] deposition," and that he "may present a safety risk to the NKU community." (Doc. # 75-9, at 1). The letter also referenced Plaintiff's continued productivity problems, and his

---

For this reason, the Court has not outlined either of these reviews herein.

[9]It should be noted that this letter repeatedly referenced Plaintiff's 2005 and 2006 Performance Reviews. *See supra* note 8.

insubordination.  (*Id.* at 5-6).

With respect to his criminal record, defense counsel stated that Plaintiff failed to disclose in his employment application that he had pled guilty to trafficking marijuana.[10]  (*Id.* at 8).  Defense counsel further noted that Plaintiff misrepresented the amount of marijuana at issue in both his application and his deposition conducted on January 13, 2007.  (*Id.*). Specifically, Plaintiff indicated in both his application and deposition that police found some seedlings in a tray that he had discarded, but an internet search revealed that he was arrested after officers discovered 53 marijuana plants in his attic.  (*Id.* at 1-3, 7-8).  Defense counsel then summarized his justification for termination as follows:

> By signing the Application, Algie certified that all of the information provided therein was accurate and complete.  The Application provided that "any misrepresentation may cause the withdrawal of an employment offer or termination of employment."  Based on this language and Paragraph C 7.43 of NKU's Employee Handbook, termination is the most appropriate action in this case.

(*Id.* at 8) (emphasis in original).

As to the safety of the NKU community, defense counsel indicated that Plaintiff had been sending letters to the university's human resources director and others regarding his coworkers' job performance, and the letters were described as "increasingly personal and heavily focused on his co-worker's actions at work."  (*Id.* at 4).  Along with one of these letters, Plaintiff attached two documents–entitled "NKU Employee Records" and "NKU Error Log"–that documented when various coworkers were tardy, took long breaks, used computers for personal matters, or made a mistake.  (*Id.* at 5).

---

[10]Plaintiff did, however, disclose that he pled guilty to cultivating marijuana.

Besides these letters and attachments, defense counsel touched on Plaintiff's increasingly hostile behavior:

> In the last ten minutes of every day, Algie waits by the door staring at his watch. Algie refuses to cooperate in any way with scheduling issues, and he becomes extremely argumentative when asked to do anything that he perceives as being outside of his job responsibilities. Additionally, Algie continues to take notes about his coworkers job performance.

(*Id.* at 7). Finally, defense counsel noted that further inquiry into Plaintiff's criminal record yielded charges for gun possession, harassment, and domestic violence and misdemeanor convictions for possession of drug paraphernalia and harassment, leading to the following summary justifying termination:

> NKU cannot ignore the safety concerns associated with Algie's arrests for gun possession, various violent crimes and his guilty plea for misdemeanor harassment. Algie's criminal record includes several prior arrests for domestic violence and harassment, among other things. While Algie was not required to disclose these charges in his Application, they are relevant to NKU's decision. These past arrests/guilty pleas combined with Algie's increased combativeness with and surveillance of coworkers and supervisors raise legitimate concerns regarding the safety of NKU's staff and student body.

(*Id.* at 7-9).

Although defense counsel's recommendation primarily focused on the misrepresentation of Plaintiff's criminal record and safety concerns, these justifications were intertwined with his poor job performance and insubordination. In the letter, defense counsel noted that Plaintiff's recent performance reviews showed that his job performance had digressed, and that he had a particular problem with his "work quantity" and ability to be a "team player." (*Id.* at 6). With respect to these issues, defense counsel opined that Plaintiff's "extracurricular undertakings"–documenting improper errors made by his coworkers–"are likely the reason why [he] struggles with 'work quantity,'" and commented

7

that Plaintiff "has made no effort to become a 'team player' in the last three years." (*Id.* at 6-7). To the contrary, his supervisors said that Plaintiff's "behavior makes his coworkers uncomfortable, and his behavior is affecting the overall productivity of the Printing Department." (*Id.* at 7).

As to his insubordination, defense counsel noted that Plaintiff was not only criticizing his coworkers via his letters to NKU's human resources director and others, but also questioning his supervisors' characters and abilities to perform their jobs. For instance, in a letter dated March 15, 2007, Plaintiff asserted that one of his supervisors "neglected her responsibilities . . . despite [his] attempts to advise her." (*Id.* at 4-5). In a letter dated May 25, 2007, Plaintiff claimed that another supervisor was deficient in his supervisory involvement and "not competent to perform the task of my position." (*Id.* at 5). Plaintiff again disparaged that same supervisor in a July 18, 2007 letter, complaining that the supervisor did not follow up with him concerning a complaint. (*Id.* at 6).

Sara Sidebottom subsequently received this letter and advised Jackson Meeks to terminate Plaintiff's employment based upon it. (Doc. #75-10). Ms. Sidebottom did not know about Plaintiff's FMLA leave at the time, and did not have any specific knowledge of his absenteeism issues. (*Id.*). On October 1, 2007, five days after the letter was dated, Plaintiff was terminated.

Having outlined the pertinent facts of this case, the Court must first pause to consider NKU's immunity, or lack thereof, and then proceed to the merits of Plaintiff's FMLA retaliation claim.

## III.   ELEVENTH AMENDMENT IMMUNITY

In its decision remanding, the Sixth Circuit set forth the following footnote:

8

> The Eleventh Amendment bars the plaintiff from obtaining damages from the state for violation of the FMLA self-care provision, *Touvell v. Ohio Dept. of Mental Retardation & Dev. Disabilities*, 422 F.3d 392, 405 (6th Cir.2005), and a state university is covered by the state's Eleventh Amendment immunity, *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 313 (6th Cir.2001).

(Doc. # 57, at 10 n.1).  More recently, the appellate court specifically held that the Eleventh Amendment does not bar suits for equitable, prospective relief against state officials in their official capacity for violation of the self-care provision.  *Diaz v. Michigan Dept. of Corr.*, 11-1075, 2013 WL 64368, at *7 (6th Cir. Jan. 7, 2013).  As a result, the court remanded the plaintiff's FMLA claim for reinstatement therein back to the district court to determine whether he sufficiently alleged an ongoing violation of federal law to maintain his equitable claim.  *Id.* at *9.

In this case, the Sixth Circuit has instructed the Court to address Plaintiff's retaliation claim, which is premised upon his request for leave as to his condition and his wife's condition and thus implicates both the self-care provision and a family-care provision of the FMLA.  *See* U.S.C. § 2612(a)(1)(C) and (D).[11]  In his Complaint, Plaintiff not only requests monetary damages, but also injunctive relief, and he has testified that he is seeking reinstatement.  (Doc. # 74-1, at 74).

As the Sixth Circuit implicitly recognized in its footnote, the Eleventh Amendment does not prohibit suits for violation of the Subsection (C) family-care provision, so NKU is

---

[11]The FMLA entitles eligible employees to take up to 12 work weeks of unpaid leave per year.  An employee may take leave under the Act for: (C) the care of a "spouse . . . son, daughter, or parent" with "a serious health condition," and (D) the employee's own serious health condition when the condition interferes with the employee's ability to perform at work.  Subparagraph (C) grants leave for reasons related to family care, and is therefore referred to as a family-care provision.  Subparagraph (D) grants leave so that an individual may address their own condition and is therefore referred to as the self-care provision.

not entitled to any immunity as to Plaintiff's FMLA claim regarding his wife's condition.  *See Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721 (2003) (holding that plaintiffs are not barred from obtaining damages from a state for violation of Subsection (C)).  More to the point, NKU's immunity as to Plaintiff's claim regarding his own condition is limited to Plaintiff's request for damages.  Because he is also seeking equitable, prospective relief, the Court will consider the merits of both aspects of his retaliation claim, i.e., whether NKU retaliated against for him for taking FMLA leave pursuant to the family-leave provision and/or the self-care provision.

## IV.    FMLA RETALIATION CLAIM

Plaintiff contends that NKU retaliated against him by terminating his employment for exercising his FMLA rights.  NKU has moved for summary judgment as to Plaintiff's retaliation claim.  (Doc. # 75).  The Court will first set forth the summary judgment standard and the contours of a FMLA retaliation claim, and then analyze his claim.

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, in deciding a motion for summary judgment, courts must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As is clear from the face of Rule 56, the "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted).  Once the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt

10

as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Rather, the
nonmoving party must produce specific facts showing that a genuine issue remains.  *Plant
v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its
entirety, a rational fact finder could not find for the nonmoving party, summary judgment
should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir.
1998).

### B.    Analysis

The Sixth Circuit has held that FMLA retaliation claims based upon indirect evidence
should be analyzed under the traditional burden-shifting framework of *McDonnell Douglas
Corporation v. Green*, 411 U.S. 792 (1973).  *Skrjanc v. Great Lakes Power Serv. Co.*, 272
F.3d 309, 315 (6th Cir. 2001).  This means that a plaintiff must first prove a prima facie
case of retaliation, and the burden then shifts to the defendant to provide a legitimate,
non-discriminatory reason for the plaintiff's termination.  *Id.*  If the defendant sets forth such
a reason, the plaintiff must show that the nondiscriminatory reason is pretext.  *Id.*

### 1.    *Prima Facie Case*

In order to prove a prima facie case of retaliation, Plaintiff must demonstrate that (1)
he was engaged in an activity protected by the FMLA; (2) NKU knew that he was exercising
his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights,
NKU took an employment action adverse to him; and (4) there was a causal connection
between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu
Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. W. Pub. Corp.*,
345 F.3d 390, 404 (6th Cir. 2003)).  Although the parties have a disagreement as to the
"adverse action" element, the primary issue before this Court is whether Plaintiff can show

11

that NKU knew he was exercising his FMLA rights.

   *a.*   ***Adverse Action***

   There is no dispute that NKU took an adverse action against Plaintiff when it terminated his employment.  However, in his response brief Plaintiff also argues that NKU "used Plaintiff's FMLA absences as a negative factor in his 2007 Performance evaluation." (Doc. # 76, at 7).  Furthermore, in his sur-reply brief, Plaintiff not only specifically contends that his "termination is not  the only adverse employment action," but also claims that he "made application for advanced positions subsequent to his FMLA and despite having comparable experience and education to the previous holder, Jo Ann Fincken, for the position of Graphic Design Manager, the position was withdrawn and determined to be filled subsequent to Plaintiff's termination."  (Doc. # 80, at 3-4).

   The Court construes Plaintiff's assertions as arguments that the review and purported denial of an advancement opportunity constituted adverse employment actions. However, these arguments are directly contradicted by his July 24, 2012 deposition, in which he testified as follows:

> Q: And your testimony, if I can paraphrase it, is that the 2007 performance review led to the termination?
>
> A: Yes, at least significantly contributed.
>
> *Q: But it's the retaliation – or it's the termination that's the act of retaliation, correct?*
>
> *A: Yes, sir, I would perceive that as so.*

(Doc. # 74-1, at 26) (emphasis added).  Because a plaintiff may not create new claims in an effort to defeat summary judgment when those claims are contrary to earlier deposition

testimony, the Court will not consider either construed argument.[12] *Cf. Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006) ("[A] party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony.") (*citing Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)).  This approach is especially justified, at least with respect to the advancement opportunity accusation, because Plaintiff also failed to direct the Court's "attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris, 260 F.3d 654, 655* (6th Cir. 2001).

> **b.    *Employer Knowledge***

The second element of a prima facie–the "knowledge" element–mandates that Plaintiff show that the person or persons responsible for his termination knew that he was exercising his rights under the FMLA.  *See Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) ("Regardless of whether employer knowledge is a stand-alone element of a prima facie case of retaliation, it is fairly clear from Sixth Circuit case law that employer knowledge of a plaintiff's protected activity is required. . . . [E]ven to prove a causal connection, [the plaintiff] must establish that the decisionmakers . . . had knowledge of the protected activity, as one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so.").  To make such a showing, a plaintiff

---

[12]Plaintiff is correct that NKU relies upon his January 7, 2009 deposition testimony in asserting that "[Plaintiff] made clear this his termination is the only retaliatory act he is pursuing in this lawsuit."  (Doc. # 76, at 2); (Doc. # 75-1, at 2-3). And it is also true that, at the time of that deposition, Plaintiff's FMLA claim was dismissed, so any references to retaliatory acts were probably only relevant to the remaining Title VII retaliation claim.  (Doc. # 76, at 2).  However, NKU's reliance upon Plaintiff's 2009 deposition rather than his July 24, 2012 deposition does not alter his testimony in the latter deposition.

need not rely exclusively on direct evidence; circumstantial evidence will suffice. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002).

Plaintiff asserts that, regardless of who made the decision to terminate him, NKU still had the responsibility to inquire into all factors before making the decision for such "extreme actions."   While he may disagree with the state of the law, Plaintiff's protestations do not relieve him of his burden, but rather constitute an abdication of his responsibility to put forth *some* evidence.

Setting aside Plaintiff's abdication, this Court can find no evidence, circumstantial or otherwise, tending to show that the person or persons responsible for his termination knew that he was exercising his rights under the FMLA.  To the contrary, Sara Sidebottom did not know about Plaintiff's FMLA leave at the time she advised Jackson Meeks to terminate his employment, and did not have any specific knowledge of his absenteeism issues.

Finally, although not touched on by Plaintiff, it is worth noting that "courts have imputed the retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision." *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009) (citations omitted).   This theory–known as the "cat's paw" doctrine–would seem particularly appropriate in this case, as the letter from defense counsel recommending termination references the 2007 Performance Review, which Plaintiff primarily focuses on in his briefing.  See *Romans v. Michigan Dept. of Human Services*, 668 F.3d 826 (6th Cir. 2012) (discussing the "cat's paw" doctrine in the context of a Title VII claim); *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666 (6th Cir. 2008) (same).  Again, though, Plaintiff has not set forth this

14

argument, and the reference to that review in defense counsel's recommendation is dwarfed by the other items mentioned therein, including Plaintiff's job application, criminal record, and letters sent to and about university personnel.  *See Long*, 585 F.3d at 352 ("[A]n independent investigation by the decisionmaker weighs heavily against a finding of excessive influence.").

Because Plaintiff offers no evidence to show that the person or persons responsible for his termination knew that he was exercising his rights, or to establish that his supervisor, via the 2007 Performance Review, exerted significant influence over the employment decision, he has failed to establish a prima facie case and NKU is entitled to judgment as a matter of law.

### *2.     Pretext*

Plaintiff's FMLA retaliation claim fails for a second reason.  NKU has set forth legitimate and nondiscriminatory reasons for his termination, and Plaintiff has not established that any of those reasons were pretextual.  This conclusion is compelled, at least in part, by the mandate rule.

Under the mandate rule, when a case has been remanded by an appellate court, "the trial court is bound to 'proceed in accordance with the mandate and law of the case as established by the appellate court.'"  *Goldberg v. Maloney*, 692 F.3d 534, 538 (6th Cir. 2012) (quoting *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)).  This means that, "[o]nce an appellate court 'decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Goldberg v. Maloney*, 692 F.3d 534, 538 (6th Cir. 2012) (quoting *Scott v. Churchill*, 377 F.3d 565, 569 (6th Cir. 2004)).

In its decision remanding, the Sixth Circuit dubbed the four reasons set forth by NKU—resume fraud, insubordination, monitoring of coworkers, and safety concerns–as "legitimate."  (Doc. # 57, at 5).  This conclusion though, pertained to Plaintiff's Title VII retaliation claim–not his FMLA retaliation claim.

"[T]he determination whether an issue was decided on appeal so as to become part of the mandate binding on remand may take on the complications that occasionally beset definition of the issue that has been decided for purposes of issue preclusion."  18B Charles Alan Wright, et al., *Federal Practice and Procedure* § 4478.3 (2d ed.2002); *see also Kosinski v. C.I.R.*, 541 F.3d 671, 675 (6th Cir. 2008) (recognizing that a litigation must show that the precise issue raised in the present case was raised and actually litigated in the prior proceeding to invoke issue preclusion).  However, there is no such complication here because both Title VII and FMLA retaliation claims obligate defendants to set forth a legitimate, non-discriminatory reason for retaliation.  The pertinent topics of inquiry, then, are the asserted reasons provided by a defendant, and it is axiomatic that those reasons must have nothing to do with the protected activity, be it an Equal Employment Opportunity Commission complaint or FMLA leave.  As a result, the Sixth Circuit's conclusion–that the four reasons set forth by NKU were legitimate–governs this Court's decision herein.

Setting aside the Sixth Circuit's decision, there can be no doubt that NKU's reasons are legitimate and nondiscriminatory.  As noted, NKU contends that it terminated Plaintiff for resume fraud; specifically, that he failed to disclose on his employment application that he pled guilty to felony trafficking of marijuana and misrepresented the amount of marijuana at issue, even though he had certified that all of the information provided therein was accurate and complete.  This is a legitimate ground for dismissal.  *Moos v. Square D Co.*,

16

72 F.3d 39, 43 (6th Cir. 1995).

NKU also alleges that it terminated Plaintiff due to his persistent insubordination, which included questioning his supervisors' characters and abilities to perform their jobs in letters sent to NKU's human resources director and others.  Insubordination is also be a legitimate, non-discriminatory justification for dismissal.  *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008).

Next, NKU asserts that it terminated Plaintiff due to his inability to work well with his coworkers and his constant monitoring of their work.  A critical attitude toward coworkers and disruptive behavior in the workplace is another potentially legitimate reason for discharge.  *Lovelace v. BP Products N. Am., Inc.*, 252 F. App'x 33 (6th Cir. 2007); *Das v. Ohio State Univ.*, 57 F. App'x 675, 681 (6th Cir. 2003).

Finally, NKU claims that it terminated Plaintiff due to safety concerns, which stemmed not only from his various convictions and arrests, but also his aforementioned difficulties with supervisors and coworkers.  Concern for safety may constitute a legitimate nondiscriminatory basis for discharge.  *Freeman v. United Airlines*, 52 F. App'x 95, 103-104 (10th Cir. 2002).

Pursuant to the mandate rule and this Court's own examination of the facts, NKU has set forth four legitimate and nondiscriminatory reasons for termination.  The next question, then, is whether Plaintiff has shown that *each* reason was simply a pretext for unlawful termination.  *Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 951-952 (6th Cir. 2007) (citation omitted).

There are three primary methods by which Plaintiff can make his required showing: by showing that NKU's proffered reasons (1) have no basis in fact; (2) did not actually

motivate the action; or (3) were insufficient to warrant the action.  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000).  Plaintiff focuses on the second method, as he contends that his 2003 and 2004 Performance Reviews demonstrate pretext because he received positive reviews therein, even though he was continually absent during that time period.  According to Plaintiff, it is only after he took FMLA leave that NKU raised the issue of excessive absenteeism in his 2007 Performance Review, which suggests pretextual reasoning.

At the outset, the Court notes that the mandate rule is inapplicable with respect to this issue, as the Sixth Circuit did not address this precise question in its decision.  Unlike the issue of whether the reasons set forth by NKU were legitimate and nondiscriminatory, the university's unlawful intent–not its asserted reasons–is the pertinent item of inquiry as to pretextual reasoning.  This distinction is supported by the fact that the 2003 and 2004 Performance Reviews were not part of the record at the time the Court of Appeals rendered its decision as to the Title VII claim, yet Plaintiff now relies upon those reviews to establish pretext with respect to his FMLA claim.  Although there may be a circumstance where the distinction between the pertinent aspect of the parties' respective burdens is without difference, the presentation of the 2003 and 2004 Reviews for the Court's  consideration as to the FMLA claim, but not to the Title VII claim, demonstrates that this is certainly not that case.

Unfortunately for Plaintiff, this Court's refusal to blindly follow the Sixth Circuit's conclusion is a hollow victory, as an independent examination of the facts reveals that Plaintiff's attempt to establish a jury question with respect to pretext nonetheless fails because it is not supported by any evidence and is unmoored from the facts discussed

18

herein.  Simply put, Plaintiff failed to point to any evidence tending to show that he was continually absent during the time periods covered by his 2003 and 2004 reviews.  *See In re Morris, supra*.  Moreover, the evidence in the record directly contradicts his assertion that  absenteeism was not raised until he exercised FMLA leave, as Plaintiff was not only assessed as needing improvement with respect to his reliability in his 2002 Performance Review, but his supervisor also twice specifically noted problems with respect to absenteeism.

Because Plaintiff failed to show that any, much less all, of the university's legitimate reasons for his termination were pretextual, NKU is entitled to entry of summary judgment.

## V.    INTERFERENCE CLAIM

In his response brief, Plaintiff also attempts to set forth an FMLA interference claim, as he argues that NKU restrained his "use of FMLA leave by denying him adequate procedural information" and harassed him with respect to the FMLA certification pertaining to his wife's condition.   However, this matter is before the Court on remand from the Sixth Circuit with instruction to address Plaintiff's FMLA retaliation claim; the appellate court did not provide any guidance as to a potential interference claim.   Moreover, it is well recognized that a plaintiff may not raise a new legal claim in response to a motion for summary judgment.   *See, e.g., Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788-789 (6th Cir. 2005).  This rule, of course, applies to FMLA claims.  *See Fountain v. WellPoint, Inc.,* No. 1:06-CV-098, 2007 WL 2071910, at *7 n.8 (S.D. Ohio July 17, 2007) (refusing to consider an FMLA interference claim that the plaintiff raised for the first time in opposing summary judgment)*; Purdy v. U.S. Cellular Corp.*, No. 305-CV-348, 2007 WL 595509, at *3 (E.D. Tenn. Feb. 21, 2007) (same).  For these

19

reasons, the Court will not consider Plaintiff's purported interference claim.[13]

## VI.  CONCLUSION

For the reasons stated, there is no genuine dispute as to any material fact and NKU is entitled to judgment as a matter of law.  Accordingly,

**IT IS ORDERED as follows:**

(1)   NKU's Motion for Summary Judgment on Plaintiff's FMLA Claim (Doc. # 75) is **granted**;

(2)   Plaintiff's FMLA retaliation claim is **dismissed;**

(3)   This matter is hereby **stricken** from the docket of the Court; and

(4)   A Judgment in favor of NKU will be entered contemporaneously herewith.

This 20th day of February, 2013.



Signed By:
*David L. Bunning* DB
United States District Judge

G:\DATA\Opinions\Covington\2008\08-109 MOO RE FMLA Retaliation.wpd

---

[13]Because the Court will not consider Plaintiff's FMLA interference claim, the remaining documents he filed in opposition to summary judgment are not discussed herein.  *See* (Doc. # 76-1) (NKU Human Resources Manual) (Doc. # 76-5) (Letter from Patricia Burke) (Doc. # 76-6) (amended second FMLA certification); (Doc. # 77) (audio recording of meeting).